UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| RAMON MONTAGUE, | ) | |
|---|---|---|
| Plaintiff, | ) ) ) | 11 C 5080 |
| v. | ) ) | Judge George M. Marovich |
| WEXFORD HEALTH SOURCES, INC. | ) ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Ramon Montague ("Montague") seeks to hold defendant Wexford Health Sources, Inc. ("Wexford") liable for a delay between the time his prison physician ordered an outside test and the time he received it. For reasons set forth below, the Court denies plaintiff's motion to strike and grants defendant's motion for summary judgment.

**I.    Background**

Montague has been incarcerated since he was convicted of murder and attempted murder. During the period of time relevant to this dispute, the state housed him at Stateville Correctional Center ("Stateville"). Defendant Wexford is a corporation that contracts with the Illinois Department of Corrections to provide health care to prisoners at Stateville (and other places not relevant to this case).

When Montague filed his original complaint, Montague asserted claims against several individuals, in addition to Wexford.[1] Because he failed to state a plausible claim against the individual defendants, the Court dismissed Montague's claims against the individuals.

---

[1]One individual defendant (John Doe-CEO Wexford Health Sources, Inc.) was never served and is dismissed for that reason.

Montague, however, stated a claim against Wexford. This is what the Court said when it dismissed the claims against the individual defendants:

> In June 2009, Montague first started suffering from stomach pain and an inability to keep down food. Montague wrote letters to sick call. His requests for treatment were ignored by Wexford and unspecified employees, including nurses.
>
> In April 2010, Montague changed his tack. He told his work-detail supervisor ("Johnson") about his pain, and Johnson arranged an appointment with defendant LaTonya Williams ("Williams"), a physicians assistant employed by Wexford. Williams examined Montague and ordered stool samples. Williams told Montague that it would take a week to get the test results and scheduled him for a follow-up appointment. Montague asserts that Williams, "inquired if I wanted something for the pain and I refused, making it known that I did not want no medication for pain not knowing what caused it." When Montague returned for his follow-up appointment the next week, Williams informed Montague that he tested positive for H.Pylori bacteria and prescribed him two antibiotics. Williams told Montague that it would take six weeks to determine whether the antibiotics were killing the H.Pylori bacteria.
>
> Montague continued to experience pain. When he complained to medical technicians, they did not help him. On or about July 7, 2010, Montague discovered blood in his stools. He complained to his work-detail supervisor, who escorted him to the emergency health care unit to be seen by Dr. Zhang. Dr. Zhang prescribed Montague Dicyclomine for his pain and scheduled him an appointment to see Dr. Ghosh.
>
> At Montague's appointment with Dr. Ghosh, Dr. Ghosh found that Montague's colon was enlarged. Dr. Ghosh told Montague that that was common in men Montague's age and that Montague did not show signs of cancer. Montague requested an MRI. Dr. Ghosh informed Montague that he would first need another round of treatment for the H.Pylori bacteria. Dr. Ghosh prescribed Dicyclomine for the pain. Montague was called in for a follow-up test the following month, at which time Dr. Ghosh ordered an MRI.
>
> Despite Dr. Ghosh's order, Montague did not actually receive an MRI until March 2011 (at least four months after Dr. Ghosh ordered it), at which point Montague was diagnosed with colon cancer. Montague alleges that the reason for the delay is Wexford's policy of making prisoners wait 3-4 months for specialty procedures unless the physician marks the request urgent. Montague alleges that other prisoners have waited 3-4 [months] for their outside treatment needs, as well.

The Court first considers plaintiff's allegations against physicians assistant Williams and concludes that Montague has not stated a plausible claim that Williams was deliberately indifferent to Montague's needs. There are no allegations that Williams knew of Montague's condition before Montague's work-detail supervisor asked Williams to see Montague in April 2010. Williams examined Montague and ordered stool samples. Williams told Montague that it would take a week to get the results and asked him if he wanted pain medication in the meantime. Montague, himself, declined the pain medication. When Montague returned a week later, Williams informed him that he had tested positive for H.Pylori and prescribed him antibiotics. She told him it would take six weeks to find out whether the antibiotics worked. Nothing in these allegations suggests that Williams was deliberately indifferent to Montague's serious health condition. To the contrary, the allegations make clear that Williams attempted to find the cause of Montague's pain and tried to prescribe him pain medication, which he refused. Montague's claims against Williams are dismissed without prejudice.

Next, the Court considers Montague's allegations with respect to Dr. Zhang. Montague does not allege that Dr. Zhang knew about Montague's condition before Montague's supervisor brought Montague to Dr. Zhang for emergency treatment on or about July 7, 2010. Montague alleges that Dr. Zhang prescribed Dicyclomine for his pain and scheduled him an appointment to see Dr. [Ghosh]. Nothing about these allegations suggests that Dr. Zhang was deliberately indifferent, and the Court dismisses without prejudice Montague's claims against Dr. Zhang.

The Court also considers Montague's allegations with respect to Dr. Ghosh. Here, again, Montague does not allege that Dr. Ghosh knew of his serious condition before his first appointment with Dr. Ghosh, which, according to Montague's allegations, was scheduled by Dr. Zhang. Montague takes issue with the fact that Dr. Ghosh did not immediately order an MRI, but Dr. Ghosh informed Montague that he first needed another round of treatment for H.Pylori. Dr. Ghosh scheduled a follow-up appointment for Montague and, at the follow-up, ordered an MRI. Nothing about these allegations suggests that Dr. Ghosh was deliberately indifferent to Montague's needs. At best, one can infer that Dr. Ghosh was negligent in not immediately assuming cancer was the cause of Montague's pain, but Montague alleges that he had tested positive for H.Pylori and, in any event, negligence does not violate the constitution. *Duckworth*, 532 F.3d at 681 ("it may have been prudent for [defendant doctor] to rule out cancer first. But this is just to reiterate the standard for medical malpractice, which falls short of deliberate indifference."). Montague does not allege that Dr. Ghosh knew and ignored the fact that several months passed between the time Dr. Ghosh ordered the MRI and when Montague actually had the MRI. For that lapse, he blames Wexford (see below). Montague has not alleged a plausible claim against

> Dr. Ghosh, and the Court dismisses Montague's claims against Dr. Ghosh without prejudice.
>
> The Court is not suggesting that no one was deliberately indifferent to Montague's needs. Whoever refused to allow Montague to see a doctor between June 2009 and April 2010 may have been deliberately indifferent to his serious health condition. In addition, whoever prevented Montague from receiving an MRI between the time Dr. Ghosh ordered it and the time Montague actually received it may have been deliberately indifferent. Montague has not alleged plausibly, however, that Dr. Ghosh, Dr. Zhang or Williams was deliberately indifferent to his serious condition.
>
> Montague has, however, stated a claim against Wexford. "Private corporations acting under color of state law may, like municipalities, be held liable for injuries resulting from their policies and practices." *Estate of Nicholas Rice v. Correctional Medical Serv.*, __ F.3d __, __, slip. op. at 48-49, 2012 WL 917291 (7th Cir. March 20, 2012) (quoting *Monell v. Dep't of Social Servs. of New York*, 436 U.S. 658, 690-91 (1978)). To state a claim, plaintiff must allege that "his injury was the result of the municipality's or corporation's official policy or custom. *Id.* Here, Montague alleges that months passed (during which time he was in constant pain) between the time Dr. Ghosh ordered the MRI and when he actually received it in March 2011. Montague alleges that Wexford had a policy in place, in order to save money, that required prisoners to wait 3-4 months in order to obtain specialty procedures. He alleges that other prisoners also had to wait months for their procedures. Montague has stated a claim against Wexford.

(Docket Entry [36], April 24, 2012). Thus, the Court dismissed without prejudice Montague's claims against the individual defendants for failure to state a plausible claim of deliberate indifference. Montague never requested leave to amend. The only claim remaining in this case is Montague's claim that Wexford's policy of requiring prisoners to wait three to four months for

specialty procedures left him in constant pain (and thus violated his constitutional rights).[2]

Wexford moves for summary judgment on that claim.

Unless otherwise noted, the following facts are undisputed.[3]

**Wexford's policies for outside referrals**

Certain medical procedures and tests are not performed within the confines of the prison. For outside treatment or testing, a physician had to make a referral for an inmate. During the

---

[2]The fact that the individual defendants did not violate plaintiff's constitutional rights does not necessarily eliminate the possibility that Wexford is liable, despite what the Supreme Court said in *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("neither [*Monell*] nor any of our cases authorizes an award of damages against a municipal corporation based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm."). The Seventh Circuit leaves room for the possibility that a non-defendant may have violated plaintiff's constitutional rights. *Thomas v. Cook Cty.*, 604 F.3d 293, 305 (7th Cir. 2010) 305 ("The County, in this case, appears to push for a rule that requires individual officer liability before a municipality can ever be held liable for damages under *Monell*. This is an unreasonable extension of *Heller*. What if the plaintiff here had only sued the County, *or didn't know, because of some breakdown in recording shifts, who the CMTs on duty were*? The actual rule, as we interpret it, is much narrower: a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an *inconsistent* verdict.") (emphasis added).

[3]Local Rule 56.1 outlines the requirements for the introduction of facts parties would like considered in connection with a motion for summary judgment. The Court enforces Local Rule 56.1 strictly. Facts that are argued but do not conform with the rule are not considered by the Court. For example, facts included in a party's brief but not in its statement of facts are not considered by the Court because to do so would rob the other party of the opportunity to show that such facts are disputed. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817-818 (7th Cir. 2004). This, of course, does not absolve the party putting forth the fact of its obligation to support the fact with admissible evidence. See *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). It is not enough at the summary judgment stage for either party to *say* a fact is disputed. The Court considers a fact disputed *only* if both parties put forth admissible evidence of his or its version of the fact. Asserted "facts" not supported by deposition testimony, documents, affidavits or other evidence admissible for summary judgment purposes are not considered by the Court.

relevant time period, Dr. Parthasarthi Ghosh ("Dr. Ghosh") was Medical Director at Stateville. Wexford never placed any limits on the number of referrals Dr. Ghosh made to community medical providers. Wexford did not discourage Dr. Ghosh from making referrals. In fact, Wexford did not even have to pay for referrals at the University of Illinois at Chicago. On average, about 35 inmates per week were sent to outside community medical providers for procedures and tests.

Some outside referrals required Wexford's approval. Whether a physician's referral required Wexford's approval depended on whether the matter was an emergency. In emergent cases, doctors at Stateville could make referrals immediately, without approval. In non-emergent cases, referrals were subject to "collegial review." During the relevant time period, Wexford held weekly "collegial reviews," during which time Stateville's Medical Director could discuss referrals with Wexford's utilization management doctors. If the doctors agreed that a referral was necessary, then the referral was approved. Once approved, the Medical Director could recommend a timeframe in which the inmate should be seen by the community health-care provider.

When a referral was approved at collegial review, a nurse (who was present at collegial review) was responsible for entering the approval into Wexford's computer system. The computer system generated an appointment report that listed the inmates who had been referred to, for example, the University of Illinois at Chicago. The report listed the inmate's name, facility, diagnosis and a timeframe in which the appointment should be scheduled. The timeframe depended upon the urgency (as determined by the Medical Director) of the referral. Suggested referral timeframes ranged from one week to three months.

To make the actual appointment, Wexford relied on the University of Illinois at Chicago ("UIC"). Wexford sent appointment reports to a scheduler at UIC, and that scheduler was

responsible for making appointments. (Those appointments were, of course, limited by the availability of doctors.) Wexford expected UIC to make appointments within the timeframes recommended by the doctors. Wexford also employed an intake coordinator, whose job it was to send the appointment reports to UIC. Wexford's intake coordinator was also responsible for maintaining daily contact with UIC to make sure the appointments were being scheduled.

**Montague's treatment**

Dr. Ghosh first saw Montague on July 2, 2010. At the appointment, Montague complained of abdominal pain and occasional rectal bleeding. Dr. Ghosh reviewed Montague's medical chart and learned that Montague had been treated for an H.Pylori infection (a stomach bacteria that causes ulcers) with antibiotics. Dr. Ghosh's clinical examination of Montague included a visual and digital rectal exam and a hemocult blood test (which tests for the presence of blood in stool). Dr. Ghosh noted an anal fissure, which he treated with a suppository. Dr. Ghosh suspected that Montague still had an H.Pylori infection, so Dr. Ghosh ordered blood tests to confirm. He prescribed a 60-day course of Bentyl to reduce intestinal spasms and relieve pain. Finally, Dr. Ghosh scheduled a follow-up appointment for early August.

On August 4, 2010, Dr. Ghosh again saw Montague, who again complained of abdominal pain. Dr. Ghosh informed Montague that the tests had confirmed that he still had an H.Pylori infection. Dr. Ghosh added prescriptions for a 14-day course of Flagyl and Amoxicillin (both antibiotics), as well as Pepto-Bismol. Dr. Ghosh scheduled a follow-up visit for two weeks later.

Montague had his next appointment with Dr. Ghosh on August 23, 2010. Montague again complained of upper abdominal pain. Dr. Ghosh conducted a clinical examination and noted epigastric tenderness. Dr. Ghosh concluded that Montague still had an H.Pylori infection. He prescribed Bentyl for pain and an anti-ulcer treatment. Dr. Ghosh considered referring Montague to UIC for an endoscopic evaluation, pending the results of another H.Pylori test.

Dr. Ghosh saw Montague again on October 1, 2010. Montague reported that his stomach pain had improved, but he still had epigastric pain in his upper stomach. Dr. Ghosh reviewed Montague's most-recent H.Pylori test and noted that Montague had a lower level of the H.Pylori bacteria than before. On October 3, 2010, Dr. Ghosh referred Montague to UIC's Digestive Disease Clinic for a gastroenterology consultation and an upper endoscopy to see whether Montague had an ulcer (which is often caused by H.Pylori bacteria) or was suffering from esophagitis. Dr. Ghosh did not mark the referral as urgent.

On November 4, 2010, the medical records director at Stateville faxed the referral to Wexford for collegial review. (It is unclear what happened to the form in the meantime.) On November 8, 2010, at the collegial review, the referral was approved. On November 10, 2010, Wexford's intake coordinator sent an electronic request to the UIC scheduler for a gastrointestinal consult for Montague within two months. (UIC schedules procedures such as endoscopies only *after* a consultation, so the consultation and the endoscopy could not be scheduled for the same day.) On January 24, 2011, UIC finally scheduled Montague's consultation for February 23, 2011. It is unclear why it took UIC more than two months to schedule the appointment. The record contains no documents that show whether or not any Wexford employee contacted UIC between November 10, 2010 and January 24, 2011 in an attempt to schedule the consultation.

On February 23, 2011, Montague had his consultation at UIC with Dr. Muhammad Mauman Jhandier ("Dr. Jhandier"). Dr. Jhandier planned for Montague to return in three weeks for an endoscopy and colonoscopy (both of which Wexford approved). Montague returned on March 11, 2011 for those procedures. The endoscopy revealed nothing abnormal, but the colonoscopy revealed a mass, which was biopsied. The biopsy revealed colonic adenocarinoma (colon cancer). Wexford approved a follow-up visit, which happened on March 17, 2011, with

Melissa Brennan, M.A. ("Brennan"). Brennan discussed with Montague that he needed a surgical procedure to remove the cancer.

Wexford received the referral for Montague's cancer surgery on March 21, 2011, and it was approved by collegial review. The surgery was scheduled for April 6, 2011. On May 18, 2011, Wexford approved a referral for Montague to obtain an oncology consultation so that a doctor could consider whether Montague should have chemotherapy. Six days later, on May 24, 2011, Montague had an appointment with Dr. Cybil Corning ("Dr. Corning"), who informed Montague that he had stage IIa colon cancer that had not metastasized. Dr. Corning suggested an evaluation to determine the likelihood of the cancer recurring and that, if Montague had a high score, he would need chemotherapy. Wexford approved the referral for the consult with Dr. Mehta Divyesh ("Dr. Divyesh"), who saw Montague on June 21, 2011. Dr. Divyesh determined that Montague had only a 13% chance of a recurrence of cancer and, thus, did not need chemotherapy. Instead, Dr. Divyesh recommended that Montague have a follow-up every three months for two years and every six months for five years after that. Dr. Divyesh also recommended a CT scan and a colonscopy every year for three years. So far, Wexford has approved these procedures, and they have occurred on schedule.

Montague was told by five Stateville inmates (whose names he does not recall) that Wexford had a policy of making inmates wait three to four months for specialty treatment.

## II. <u>Summary judgment standard</u>

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" Fed. R. Civ. P. 56(a). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the

non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### III. Discussion

#### A. Plaintiff's motion to strike

Before the Court considers the merits, it must consider plaintiff's motion to strike defendant's response to one of his requests to admit. Plaintiff propounded a request to admit that asked defendant Wexford to admit:

> There is no direct or documentary evidence that any Wexford employee or agent contacted the University of Illinois Chicago Medical Center any time between November 10, 2010 and January 24, 2011 (exclusive) to inquire about the status of the request for a gastrointestinal consult for the plaintiff.

(Plaintiff's Request to Admit ¶ 6). Defendant responded:

> Defendant objects to this request as vague and ambiguous as to the phrase "direct or documentary evidence'. Without waiving any objection, Defendant states that Lori Buzonas, a former Wexford Intake Coordinator (now deceased) frequently and regularly communicated and followed up with Barbara Johnson, a UIC employee responsible for scheduling the request for a gastrointestinal consult for the plaintiff, regarding outstanding appointment dates. Ms. Buzonas' e-mails and telephonic records, which may show communications with Ms. Johnson or someone else at UIC inquiring about the status of the request for gastrointestinal consult for the plaintiff, are no longer recoverable.
>
> However, based on her custom and practice as a Wexford Intake Coordinator, Ms. Buzonas would have followed up via telephone and/or e-mail, with Ms. Johnson or someone else at UIC, at some point between November 10, 2010 and January 24, 2011(exclusive) to inquire about the status of Wexford's request that UIC schedule the Plaintiff for a gastrointestinal consult.

(Defendant's Response to ¶ 6). Plaintiff states that the Court should strike the response and deem the request admitted because defendant "essentially admits the substance of plaintiff's request, and to the extent it appears to contest it, it impermissibly relies on unsubstantiated general allegations of Ms. Lori Buzonas' 'custom and practice'."

The Court denies the motion to strike, because it is unnecessary to strike the response. The Court can simply interpret the response. The Court agrees with plaintiff that defendant essentially admitted it has no *documentary* evidence (of any contact between UIC and Wexford to schedule Montague's appointment) when it stated that the documentary evidence that might have existed is no longer recoverable (presumably from a computer or back-up tape). The Court, however, sees nothing wrong with defendant's response as to the "direct" evidence of contact. Defendant describes the usual practice of Buzonas and Johnson, each of whom testified about their usual practice in depositions (which were provided to the Court in support of the parties' statements of fact for this motion for summary judgment).

The motion to strike is denied.

### B. Montague's claim against Wexford

Montague's claim against Wexford is that Wexford had a policy of making inmates wait three to four months for specialty procedures and that the policy caused a violation of his Eighth Amendment right to be free from cruel and unusual punishments.

A "private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself." *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). The corporation can be liable under § 1983 if the "unconstitutional act was caused by: (1) an official policy adopted and

promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty.*, 604 F.3d 293, 303 (7th Cir. 2010). What is needed to show a widespread practice "is evidence that there is a true municipal policy at issue, not a random event. If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer that there is a policy at work, not the kind of isolated incident that [*Bd. of County Comm'r of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)] held cannot support municipal liability." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005).

Here, plaintiff has produced no evidence from which a reasonable jury could conclude that Wexford had an explicit policy of making inmates wait three to four months for specialty procedures. To the contrary, the undisputed evidence is that Stateville's Medical Director had the authority to make emergency referrals without approval from Wexford. Non-emergency referrals required approval through collegial review, which occurred weekly. The evidence is undisputed that once a referral was approved by collegial review, Wexford sent UIC a list of the appointments it requested for inmates. Wexford sent such a list every day. Wexford gave UIC timeframes (suggested by the physicians) for each requested appointment, and those timeframes ranged from one week to three months, depending on the urgency of the procedure.

In the absence of an explicit policy, Plaintiff argues that Wexford had a widespread practice of making inmates wait months for procedures. As evidence, Montague points to his own case, but he needs evidence that *many* people experienced delays. Montague has put forth no such evidence. Instead, Montague argues that every day his appointment was not scheduled is a "separate incident," thereby evidencing a practice. The argument is not compelling.

Montague's referral for endoscopy is *one* incident of a delayed referral. Plaintiff puts forth no others. The record contains, however, several instances in which Montague obtained an outside referral *quickly*. Montague had surgery to remove the colon cancer less than three weeks after a doctor recommended the surgery. On May 24, 2011, Dr. Corning informed Montague that his cancer had not metastasized. Dr. Corning also recommended for Montague an evaluation to determine the likelihood of recurrence in order to determine whether Montague should undergo chemotherapy. That evaluation occurred less than four weeks later, when Montague saw Dr. Divyesh. Montague has not put forth evidence of a widespread practice of forcing inmates to wait three to four months for treatment outside of the prison.

Because Montague has put forth no evidence from which a reasonable jury could conclude that Wexford had a policy or a widespread practice of requiring inmates to wait three to four months for outside specialty procedures, his claim against Wexford fails as a matter of law. Defendant is entitled to judgment as a matter of law. Accordingly, the Court grants Wexford's motion for summary judgment.

## IV. Conclusion

For the reasons set forth above, the Court denies plaintiff's motion [143] to strike and grants defendant's motion [124] for summary judgment. Case closed.

                ENTER:

                _____
                George M. Marovich
                United States District Judge

DATED: July 28, 2014